J-A24041-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | |
|---|---|
| FRANCIS X. GRIMES, | : IN THE SUPERIOR COURT OF |
| | : PENNSYLVANIA |
| Appellant | : |
| | : |
| v. | : |
| | : |
| POLYMER DYNAMICS, WILLIAM | : |
| PEOPLES, DONALD LABARRE, | : |
| ESQUIRE, GROSS MCGINLEY, LLP., | : |
| PAFCO INVESTMENTS LLC., and PETER | : |
| FERENTINOS, | : |
| | : |
| Appellees | : No. 378 EDA 2015 |

Appeal from the Judgment Entered December 23, 2014,
in the Court of Common Pleas of Philadelphia County,
Civil Division, at No(s): November Term, 2011 No. 00675

BEFORE:    PANELLA, WECHT, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:    **FILED OCTOBER 27, 2015**

Francis X. Grimes appeals from the judgment entered on December 23, 2014, wherein the trial court entered a non-jury verdict in favor of Grimes and assessed damages of $40,312 against Polymer Dynamics, Inc. (PDI).[1] Grimes also challenges the order of November 6, 2014 which granted

---

[1]  We observe that "[a] verdict favoring either the plaintiff or defendant following jury or non-jury trials in civil actions for damages is not appealable until judgment has been entered on the verdict." ***Ruffing v. 84 Lumber Co.***, 600 A.2d 545, n. 2 (Pa. Super. 1991). Grimes did not praecipe for entry of judgment in his favor in accordance with Pa.R.C.P. 227.4. "In the absence of the entry of such judgment, this appeal is premature" and subject to quashal. ***Dennis v. Smith***, 431 A.2d 350, 350-51 (Pa. Super. 1981).  This Court considered the issue of whether to quash such an appeal in ***Mackall v. Fleegle***, 801 A.2d 577 (Pa. Super. 2002).  In that case, the appellant appealed from the order denying post-trial motions and neither party

*Retired Senior Judge assigned to the Superior Court.

summary judgment against him and in favor of William Peoples, Donald LaBarre, Esquire, and Gross McGinley, LLP. We affirm the order granting summary judgment in favor of Peoples, LaBarre, and Gross McGinley. We vacate the judgment and remand to the trial court to re-calculate damages.

This case has a complicated factual and procedural history.[2] In 1995 and 1996, PDI[3] purchased machinery from Bayer Corporation in connection with its manufacturing business. PDI began to experience problems with the machinery, and Bayer was unable to remedy the problems to PDI's satisfaction. However, PDI's in-house experts were able to determine the cause of the problem and engineered a solution. Bayer then began to market a new machine purportedly utilizing the solution engineered by PDI.

---

praeciped for entry of judgment. This Court held that under those circumstances, we would not quash the appeal and "in the interests of judicial economy we will regard as done what ought to have been done." *Id*. at 581 (quotation omitted). Therefore, although Grimes did not praecipe for judgment, in accordance with *MacKall*, we will not quash this appeal as interlocutory.

[2] The history of this case is somewhat murky due in large part to the fact that there have been numerous lawsuits involving these issues, and this Court is unable to find any comprehensive factual history. We have done our best to cobble together the salient facts of this case from several related cases in the Court of Common Pleas of Philadelphia County and the United States District Court for the Eastern District of Pennsylvania.

[3] William Peoples is the president of PDI. Peoples has represented himself throughout the instant litigation. It is unclear from the record whether PDI is a going concern at this juncture. Peoples has stated that PDI is "an active corporation" but "ceased its manufacturing and business operations as of 2009." Peoples Motion for Summary Judgment, 6/17/2013, at ¶ 3. However, PDI is not represented and has not participated in this litigation.

In 1999, PDI, represented by Bruce McKissock, Esquire and his firm, McKissock & Hoffman, P.C. (M&H), filed a complaint in the United States District Court for the Eastern District of Pennsylvania against Bayer for, *inter alia*, theft of trade secrets and negligent misrepresentation (Bayer Litigation). The record reveals that PDI believed the lawsuit would result in a verdict in its favor for approximately $100 million. The case went to trial on May 9, 2005, and on June 24, 2005, the jury returned a verdict in favor of PDI and against Bayer for $12,500,261.

Due to the expensive nature of this litigation, and lacking funds, PDI sought investors to advance litigation costs in exchange for promissory notes, which would be payable with a percentage of the share of PDI's anticipated large recovery in the Bayer Litigation. In other words, PDI sought to create a fund to pay for trial litigation. (Litigation Fund).[4] Then, once the verdict was rendered, PDI needed additional funding to pursue its

---

[4] We observe that it appears to this Court that these agreements may be champertous. The common law doctrine of champerty is defined

> by Black's Law Dictionary as: [a]n agreement between an officious intermeddler in a lawsuit and a litigant by which the intermeddler helps pursue the litigant's claim as consideration for receiving part of any judgment proceeds; ... an agreement to divide litigation proceeds between the owner of the litigated claim and a party unrelated to the lawsuit who supports or helps enforce the claim.

*Frank v. TeWinkle*, 45 A.3d 434, 438 (Pa. Super. 2012) (quotation omitted). Because this issue was not raised in the trial court, we do not address it on appeal.

appeal.[5]  The issues in the instant matter arise from how those who invested in the Litigation Fund were reimbursed.

On October 15, 2007, McKissock signed a letter stating that payments to participants in the Litigation Fund "will be paid prior to any payment to Counsel under their fee agreement" with PDI. Letter from McKissock, 10/15/2007.  On May 31, 2008, PAFCO,[6] which had valid UCC-1 filings based on its loans, entered into a forbearance agreement.  PAFCO agreed to a first priority security interest in the proceeds from the Bayer Litigation, "except for any attorney fees that may be due [PDI's] legal counsel." Forbearance Agreement, 5/31/2008, at ¶ 2.

On August 28, 2008, McKissock signed another agreement with PDI, which again confirmed that the Litigation Fund investors were to be paid before any attorney's fees to McKissock.[7]   These terms made the Litigation

---

[5] Bayer also appealed that verdict.

[6] PAFCO is a New Jersey limited liability corporation.  PAFCO's managing member, and Peoples' contact, is defendant Peter Ferentinos.

[7] The specific terms of the agreement were set forth in a trial court opinion in a related case.

> The agreement provides in pertinent part as follows:

> NOW THEREFORE, in consideration of McKissock's agreement to continue prosecution of this litigation, it is hereby agreed and intended between the parties on the following fee arrangement:

1. Based on the current award of $12.5 Million, plus accrued interest, McKissock shall be entitled to a 1/3 gross legal fee;

2. From the 1/3 gross legal fee, for and in consideration of loan accommodations in an amount of up to Three Million Dollars ($3,000,000.00) to the Polymer Dynamics Litigation Fund, McKissock has agreed to pay principal, interest and incentive to the Polymer Dynamics [L]itigation [F]und note holders, as [identified].

a. This payment has priority over any and all other payments and will be paid prior to any payment to McKissock under this fee arrangement with PDI or payment of obligations under the March 1, 2005 Revised Fee Agreement with M&H.

3. Should the Third Circuit grant a new trial and additional damages are recovered, or alternatively, if Bayer would agree to a resolution of this claim above the current award amount, that increased award and/or settlement shall not be subject to the 1/3 agreement, but shall be subject to a sliding scale contingency fee to be mutually agreed upon between PDI and McKissock, which agreement shall recognize M&H's right to recover expenses advanced and its contingency fee interest in the $12.5 Million Verdict under the terms of the March 1, 2005 Revised Fee Agreement.

4. The firm of M&H shall subordinate its right to repayment of their expenses and its right to receive its contingent fee interest in the $12.5 Million Verdict to the payout of the PDI Litigation Fund expense. Once the PDI [L]itigation [F]und expenses are satisfied, any remaining portion of the 1/3 gross legal fee on the $12.5 Million Verdict will be allocated to reimburse M&H for expenses advanced and to the payment of M&H's contingency fee agreement (the March 1, 2005 Revised Fee Agreement) in that Verdict.

5. In regards to any tax liens, the balance of the award recovery, net of the attorney fees/litigation fund payments, would exceed any pending tax lien.

Fund attractive to investors. Two such investors were William B. Fretz[8] and Ardleigh Investors,[9] who invested $150,000 and $125,000 respectively into the Litigation Fund in exchange for promissory notes.

On January 8, 2009, the Third Circuit affirmed the verdict in the Bayer Litigation, and remanded the case to the district court to calculate post-judgment interest. In September 2009, PDI and Bayer entered into a

---

6. If no further recovery is obtained, then McKissock will receive no further compensation for the legal services he has rendered in this matter. However, PDI shall be responsible for reimbursement of out-of-pocket costs advanced by McKissock.

7. Representatives of the firm of M&H shall continue to maintain client-attorney confidentiality requirements with respect to this Agreement and all other information known about PDI during the time frame that the Bayer litigation remains open.

8. This Agreement constitutes the entirety of the Amended and Restated Fee Agreement entered into between PDI, McKissock and M&H, and the terms and conditions of this Agreement shall be controlled by applicable Pennsylvania law. Any dispute regarding payment of fees or reimbursement of costs on this matter shall be resolved by binding arbitration between the parties.

**WFIC, LLC v. Labarre, Jr.**, 2015 WL 2338958 (Pa.Com.Pl. May 11, 2015), at *1-*2.

[8] Fretz was a shareholder of PDI and a general partner of Tiger Investment Partners, LP. He invested in the Litigation Fund on June 9, 2005. On February 11, 2011, Fretz assigned the promissory note to Grimes.

[9] Ardleigh invested these funds on October 15, 2007. Grimes purportedly was a partner in this firm. On March 4, 2011, Ardleigh assigned the promissory note to Grimes.

settlement agreement whereby Bayer would pay PDI $14,412,765.65, which was the verdict plus post-judgment interest.[10] PDI deposited the settlement amount in the trust account of Donald LaBarre, Esquire and his firm, Gross McGinley, LLP.

The trial court outlined the distribution of these proceeds as follows.

> These proceeds were held in Gross McGinley['s] escrow account. PAFCO had a secured interest position in these verdict proceeds with priority over all others who claimed an interest in these proceeds, including Grimes. Secured creditors with valid UCC-1 filings receive priority distribution from their debtors over unsecured creditors. The IRS, the Commonwealth of Pennsylvania and the City of Allentown were owed back taxes which were satisfied from the verdict proceeds. Once the tax obligations were satisfied, the balance remaining in the escrow account was insufficient to pay PAFCO in full. As a result, PAFCO agreed to reduce the balance owed it and agreed to accept the remaining amount as payment. The verdict proceeds balance in the Gross McGinley [] escrow account belonged to PAFCO.
>
> PAFCO agreed to permit [PDI] and Peoples to return principal loaned by other litigation fund lenders from the remainder of the verdict proceeds after specific amounts were paid to PAFCO. Additionally, PAFCO, who was legally privileged to receive the remaining funds held in escrow, agreed to distribute the proceeds at issue here to the LaBarre [D]efendants and Peoples.

---

[10] Also in 2009, PDI, through the law firm of Bochetto & Lentz, filed a complaint against McKissock and M&H for legal malpractice. On June 1, 2012, summary judgment was granted in favor of McKissock in that case. Additionally, McKissock filed a claim against PDI for his fee. After the trial court's order denying his motions to compel arbitration, was affirmed by this Court, McKissock has taken no further action. **McKissock v. PDI**, 32 A.3d 840 (Pa. Super. 2011), *appeal denied*, 54 A.3d 349 (Pa. 2012).

Trial Court Opinion, 11/6/2014, at 2 (footnotes omitted).[11]

On November 10, 2011, Grimes filed a complaint against all of the defendants. That complaint set forth the following counts: Count 1 - breach of contract against PDI, LaBarre, Gross McGinley, and Peoples; Count 2 - intentional interference with contractual relations against PAFCO, Ferentinos, LaBarre, Gross McGinley, and Peoples; Count 3 - fraud against Peoples and PDI; Count 4 - conversion against all defendants; Count 5 - civil conspiracy against all defendants; and, Count 6[12] - unjust enrichment against all defendants.

On February 21, 2012, Grimes obtained a default judgment against PDI. On June 17 and 18, 2013, after the close of pleadings, the remaining defendants filed motions for summary judgment.[13] On August 23, 2013, this matter was placed on deferred status pending the resolution of a relevant legal issue in a related case. *See **WFIC, LLC v. LaBarre***, 34 Pa.D.&C. 5th

---

[11] PAFCO's rights arose from two UCC-1 filings. PAFCO lent the Litigation Fund almost $1 million in 2004. Also in 2004, PAFCO obtained a 1999 UCC-1 security interest in PDI's assets, which gave PAFCO an absolute first priority right to receive over $2 million. *See* Trial Court Opinion, 8/14/2014. As of May 31, 2008, PAFCO was owed over $8 million.

[12] This count is mistakenly listed as a second Count 5 in the complaint.

[13] Three motions were filed. One was filed by Peoples, one by PAFCO and Ferentinos, and one by LaBarre and Gross McGinley.

119 (2013).[14]  In that case, the trial court granted summary judgment in

favor of the defendants, holding that Martin did not have a security interest

---

[14] The facts of that case are equally as complicated.  On September 27, 2011, WFIC filed a complaint against, *inter alia*, LaBarre, Gross McGinley, Peoples, PAFCO, Ferentinos, Bochetto & Lentz, and all Litigation Fund Investors, including Fretz and Ardleigh.  In the complaint, WFIC asserted the following:

To fund the Bayer Litigation, Larry Martin made three loans to PDI between October 1, 1998 and March 25, 1999.  Martin confessed judgment against PDI for over $1 million.  Martin entered into a settlement agreement with PDI in 2001, which provided that Martin would have first priority over any proceeds from the Bayer Litigation, after satisfaction of attorneys' fees and tax liens.  On October 26, 2001, Martin filed a UCC-1 financing statement to establish its security interest.

Martin's attorney, Turner, did not renew that statement timely.  Martin sued Turner for legal malpractice, and the malpractice insurance carrier paid Martin his whole claim.  Martin assigned his rights in the promissory notes to Turner, who assigned them to his malpractice carrier, West Chester Fire Insurance Company.  The malpractice carrier formed WFIC, LLC solely for the purpose of receiving the assignment and suing multiple defendants.  WFIC claimed, *inter alia*, that McKissock, PDI and Peoples knew that they would not be able to get additional funding for the Bayer Litigation appeal as long as Martin was the senior secured creditor.

Because Martin's first priority would be paid after attorneys' fees, Martin claimed that McKissock, PDI, and Peoples fraudulently entered into an agreement where the new Litigation Fund investors would be paid from the attorney's fees owed to McKissock.

Furthermore, Martin alleged that Peoples and Ferentinos knew that PAFCO's interest was subordinate to Martin's interest.  Thus, Martin claims that in 2009, Peoples and Ferentinos engaged LaBarre and Gross McGinley (an attorney and firm that did business with Ferentinos) to escrow the proceeds from the Bayer Litigation and distribute it as directed by the two of them to ensure that the Litigation Fund investors would be paid back prior to Martin.  Moreover, Martin alleged that Peoples and Ferentinos entered into an agreement whereby Ferentinos/PAFCO would not pursue any claims

superior to any other unsecured creditor because he failed to renew his UCC-1 statement when it expired in 2006. Thus, WFIC/Martin was not entitled to any funds.[15] After resolution of that issue, the trial court could then turn back to consider Grimes' claims.

On August 18, 2014, the trial court granted summary judgment in favor of PAFCO and Ferentinos and dismissed them from the case.[16] In opposition to the PAFCO/Ferentinos motion for summary judgment, Grimes argued that an attorney's charging lien was created by the agreement between McKissock and PDI on August 28, 2008. The trial court disagreed with Grimes. In concluding that August 28, 2008 agreement did not create a charging lien, the trial court held that PAFCO was the senior secured creditor of the Litigation Fund. **See** Trial Court Opinion, 4/14/2014, at 5-6. Based upon this holding, Grimes voluntarily discontinued his breach of contract claims against all defendants except PDI. The trial court denied

_____

against Peoples in exchange for receiving the proceeds of the Bayer Litigation ahead of Martin.

[15] That order is the subject of an appeal to this Court filed on June 9, 2015 and docketed at 1985 EDA 2015. Moreover, Bochetto & Lentz filed a wrongful use of civil proceedings against WFIC for bringing the **WFIC v. LaBarre** action. That case was dismissed by preliminary objection, and that order was affirmed by a panel of this Court. **See Bochetto & Lentz v. WFIC**, 2828 EDA 2014 (Pa. Super. filed July 30, 2015). Bochetto & Lentz has petitioned our Supreme Court for allowance of appeal at docket number 514 EAL 2015.

[16] Grimes has not appealed from that order.

motions for summary judgment filed by Peoples, LaBarre, and Gross McGinley.

On September 13, 2014, Peoples filed a second motion for summary judgment. On September 16, 2014, LaBarre and Gross McGinley filed a supplemental motion for summary judgment. On November 6, 2014, the trial court granted summary judgment in favor of LaBarre, Gross McGinley, and Peoples. On the same day, the trial court scheduled a non-jury trial to liquidate damages for Grimes' default judgment against PDI. On December 23, 2014, the trial court assessed damages of $40,312 in favor of Grimes and against PDI. Grimes timely filed a motion for post-trial relief, which was denied on January 5, 2015.

Grimes filed a notice of appeal. The trial court did not order Grimes to comply with Pa.R.A.P. 1925.

On appeal, Grimes sets forth two issues for our review.

1. In this case involving the distribution of proceeds recovered in litigation, did the court below commit a reversible error of law when it granted the motions for summary judgment of [LaBarre, Gross McGinley, and Peoples,] holding that, as a matter of law, [Grimes] could not recover against those defendants for wrongfully distributing the proceeds because a secured creditor, [PAFCO] was entitled to the entire fund and approved all distribution, notwithstanding that PAFCO's security interest expressly made an exception for the litigation attorney's fees and, therefore, PAFCO was not entitled to the entire fund?

2. Did the court below commit a reversible error of law when it held, following an assessment of damages hearing with respect to [Grimes'] breach of contract against [PDI] that [Grimes] was

not entitled to recover the shares of the Bayer proceeds which PDI promised to pay [Grimes'] assignors in return for their loans to PDI?

Grimes' Brief at 6-7.

With respect to Grimes' challenge to the trial court's grant of summary judgment in favor of Peoples, LaBarre, and Gross McGinley, we set forth our well-settled scope and standard of review.

> Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.
>
> Summary judgment is appropriate only when the record clearly shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The reviewing court must view the record in the light most favorable to the nonmoving party and resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Only when the facts are so clear that reasonable minds could not differ can a trial court properly enter summary judgment.

*Hovis v. Sunoco, Inc.*, 64 A.3d 1078, 1081 (Pa. Super. 2013) (quoting *Cassel–Hess v. Hoffer*, 44 A.3d 80, 84–85 (Pa. Super. 2012)). "Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof … establishes the entitlement of the moving party to judgment as a matter of law." *Young v. PennDOT*, 560 Pa. 373, 744 A.2d 1276, 1277 (2000) (noting that under Pa.R.C.P. No. 1035.2, grant of summary judgment is proper when "an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the causes of action … which in a jury trial would require the issues to be submitted to a jury").

*Markovsky v. Crown Cork & Seal Co.*, 107 A.3d 749, 755 n.4 (Pa. Super. 2014).

Grimes contends the trial court erred in granting summary judgment in favor of Peoples, LaBarre, and Gross McGinley on his conversion, intentional interference with contractual relations, civil conspiracy, and unjust enrichment claims.[17] Grimes sets forth a lengthy factual summary to support his arguments with respect to all four claims. Grimes' Brief at 22-32.

Grimes contends McKissock was entitled to $4.8 million from the Bayer Litigation settlement, and McKissock subordinated his right to that $4.8 million to the Litigation Fund investors. According to Grimes, LaBarre represented to the IRS that McKissock was entitled to that $4.8 million. With this background, Grimes sets forth the purported conspiracy. He contends that Peoples and LaBarre "fraudulently expanded the size of the Litigation Fund by including [their] former employees, friends, [and] family members as Litigation Fund investors when, in actuality, they did not loan money to PDI to finance the Bayer [L]itigation and, therefore, were not Litigation Fund members." Grimes' Brief at 23-24.

---

[17] While the complaint lists a cause of action for fraud against both Peoples and PDI, that count was never the subject of any motion for summary judgment or response thereto. However, Peoples was dismissed from the case and a verdict was entered in favor of Grimes and against PDI. Neither Grimes nor Peoples mentions fraud on appeal. Therefore, Grimes has abandoned any claim for fraud against either defendant.

Specifically, Grimes contends that in 2007, the amount owed to Litigation Fund investors was $1,554,330.92. In 2008, the amount owed to Litigation Fund investors was $1,760,141. In 2009, that amount increased to $4,664,924.44. According to Grimes, those loans that appeared on the list of Litigation Fund investors between 2008 and 2009 were from "employees, friends (Ferentinos/PAFCO, D. Kocher) and family members (Carolyn Peoples, C. Peoples, D. Peoples) of Peoples." *Id*. at 25.

Grimes further contends that because the PAFCO security agreement "made an exception for attorney's fees, $4.8 million of the [Bayer Litigation settlement] were unsecured." *Id*. at 29. Thus, Grimes claims that LaBarre, Gross McGinley, and Peoples should be liable for conversion, intentional interference with contractual relations, civil conspiracy, and unjust enrichment.

LaBarre and Gross McGinley respond by arguing that because "no such fee was paid" to McKissock, PAFCO properly received the entire amount of the settlement. LaBarre/Gross McGinley Brief at 9. They further argue that in any event, the amount owed to PAFCO exceeded the available funds. Peoples argues that he did not receive any funds from the settlement. Peoples' Brief at 32.

The trial court concluded that PAFCO "was legally privileged to receive the remaining funds held in escrow" and make agreements to disburse funds

as it saw fit. Trial Court Opinion, 11/6/2014, at 2. Thus, the trial court concluded that because PAFCO was entitled to distribute the funds, any claim for conversion, tortious interference with contractual relations, unjust enrichment, and civil conspiracy against all of the defendants fails as a matter of law. *Id*. at 3.

With these arguments in mind, we address each claim seriatim.

**Conversion**

"A conversion is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." ***Stevenson v. Econ. Bank of Ambridge***, 197 A.2d 721, 726 (Pa. 1964). Moreover, to maintain an action for conversion, one "must have … the right to immediate possession at the time of the conversion." ***Potts Run Coal Co. v. Benjamin Coal Co.***, 426 A.2d 1175, 1178 (Pa. Super. 1981).

> A plaintiff who has perfected a security interest in collateral has a sufficient interest to maintain an action for conversion in appropriate circumstances. When a debtor disposes of collateral which has been subjected to a perfected security interest, the secured party may bring an action against the debtor on the original debt or to collect the proceeds from a sale of the collateral, or he may proceed against the transferee of the collateral in replevin or in trespass for conversion.

***Chrysler Credit Corp. v. Smith***, 643 A.2d 1098, 1100 (Pa. Super. 1994) (citations omitted).

- 15 -

Instantly, Grimes is, at best, an unsecured creditor. An unsecured creditor does not have a legally enforceable property interest. *See Nemirovsky v. Nemirovsky*, 776 A.2d 988 (Pa. Super. 2001) (holding an unsecured creditor does not have a sufficient property interest to permit it to intervene). Thus, Grimes did not have a right to immediate possession of the proceeds at the time of the purported conversion. Accordingly, his conversion claim must fail as a matter of law.

## Intentional Interference With Contractual Relations

> The elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are as follows:
>
> (1) the existence of a contractual … relation between the complainant and a third party;
>
> (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, …
>
> (3) the absence of privilege or justification on the part of the defendant; and
>
> (4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Reading Radio, Inc. v. Fink*, 833 A.2d 199, 211 (Pa. Super. 2003) (citing *Strickland v. University of Scranton*, 700 A.2d 979, 985 (Pa. Super. 1997)).

The contract at issue here was between Grimes' assignors and PDI, through Peoples. Grimes has failed to set forth any convincing argument as

to how LaBarre, Gross McGinley, or Peoples interfered with the contract between Grimes' assignors and PDI. Specifically, Grimes' claim is premised on whether "LaBarre's conversion [was] purposeful?" However, we have already concluded that Grimes' conversion claim failed as a matter of law. Accordingly, we agree with the trial court that summary judgment was proper with respect to Grimes' intentional interference with contractual relations claim.

**Unjust Enrichment**

Finally, Grimes contends that LaBarre, Gross McGinley, and Peoples should be liable to him for unjust enrichment. Grimes' Brief at 39.

> A claim for unjust enrichment arises from a quasi-contract. "A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." ***AmeriPro Search, Inc. v. Fleming Steel Co.***, 787 A.2d 988, 991 (Pa. Super. 2001).

>> The elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. Whether the doctrine applies depends on the unique factual circumstances of each case. In determining if the doctrine applies, we focus not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.

>> Moreover, the most significant element of the doctrine is whether the enrichment of the defendant is unjust. The doctrine does not apply simply

> because the defendant may have benefited as a result of the actions of the plaintiff.

***Stoeckinger v. Presidential Fin. Corp. of Delaware Valley***, 948 A.2d 828, 833 (Pa. Super. 2008) (quoting ***Styer v. Hugo***, 619 A.2d 347, 350 (Pa. Super. 1993) (quotation marks omitted)).

Once again, Grimes is an unsecured creditor. He cannot show that any payments made to PAFCO, Peoples, or LaBarre were unjust with respect to him, because it was not clear that he was entitled to receive anything. Accordingly, Grimes' claim for unjust enrichment fails.

**<u>Civil Conspiracy</u>**

"A cause of action for conspiracy requires that two or more persons combine or enter an agreement to commit an unlawful act or to do an otherwise lawful act by unlawful means." ***Burnside v. Abbott Labs.***, 505 A.2d 973, 980 (Pa. Super. 1985) (citations omitted). "Additionally, absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act." ***Goldstein v. Phillip Morris, Inc.***, 854 A.2d 585, 590 (Pa. Super. 2004) (internal quotation omitted).

Presumably, Grimes' claim for civil conspiracy arises from either conversion, intentional interference with contractual relations, or unjust enrichment. Because we agree that the trial court properly granted summary judgment on those claims, Grimes cannot maintain an action for civil conspiracy. Accordingly, Grimes is not entitled to relief.

Having concluded that the trial court did not err with respect to its disposition of the remaining claims against LaBarre, McGinley, and Peoples, we affirm the order of the trial court granting summary judgment.

**Verdict Against PDI**

We now turn to Grimes' second argument on appeal wherein he contests the damages entered by the trial court against PDI.[18]  Specifically, he contends that the trial court erred in failing to add "litigation participation" to the award. Grimes' Brief at 41.

> Our standard of review in a non-jury trial is clear. We must determine whether the findings of the trial court are supported by competent evidence and whether the trial judge committed error in the application of law. Additionally, findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed absent error of law or abuse of discretion.

***Stonehedge Square Ltd. P'ship v. Movie Merchants, Inc.***, 685 A.2d 1019, 1023 (Pa. Super. 1996).

According to Grimes' proposed findings of fact, he requested a total of $275,000 in "litigation participation" as part of his damages. Memorandum in Support of Damages to be Assessed, 12/4/2014, at 2.  Grimes testified about litigation participation at the assessment of damages hearing.

> [Counsel for Grimes:] And is there an item for litigation participation?  What does this mean?

---

[18] Given that PDI has not participated in this litigation, this issue may be merely an academic exercise.

[Grimes:]  Yes.  That was part of the -- again, pursuant to the note there was a participation in the litigation.  The purpose of the note was an investment into a litigation that was pending before the Court where an attorney needed and a company needed some funds.

So this was to help them pursue that litigation and pursuant to the note for every $25,000 investment you were to receive a .2 percent participation in the ultimate outcome of that.

[Counsel for Grimes:] So is it fair to say that litigation participation is essentially profit?

[Grimes:] Correct.

N.T., 12/8/2014, at 6.

The trial court declined to add this portion of the damages to the verdict reasoning as follows. Order, 12/23/2014.

The language [of the promissory notes] specifically identifies the entire unpaid balance of the principal of the demand note, late charges, and interest as of the date of default as damages to be claimed.  Litigation participation is not identified.  In the absence of any specific language requiring the payment of litigation participation at the time of default, the litigation participation requested by Grimes is not subject to assessment. Consequently, the interest and late fee damages, which are calculated based on the litigation participation, are not recoverable.

Trial Court Opinion, 12/23/2014, at 3.[19]

---

[19] The trial court also concluded that "expenses incurred in obtaining a return of the principal investment and attorney fees are proper damages to be assessed against PDI per the promissory notes." Trial Court Opinion, 12/23/2014, at 3.

Instantly, our review of the promissory notes reveals that they specifically include litigation participation as an element of damages. Both promissory notes are identical, and provided, in relevant part, as follows:

> [PDI] promises to pay to the order of [Ardleigh] the principal sum of [$125,000], plus interest as follows:
>
> (a) Interest payable on demand 60 days after the verdict and/or settlement of the [Bayer Litigation] with interest….
>
> (b) participation in the verdict/settlement [(Bayer Litigation)] at .2% as per the attached schedule….
>
> ***
>
> In the event a judgment is obtained upon the Demand Note by confession or otherwise or a complaint is properly filed, a reasonable attorney collection fee of 25% of the principal of this Demand Note or Ten Thousand ($10,000) Dollars, whichever is greater, shall be payable and shall be recoverable in addition to all other sums due in the costs of suit.

Promissory Demand Note, 10/15/2007.[20]

The attached schedule referred to in subsection (b) provided that the "investment is doubled with an award of $12,500,000, tripled at $25 million; quadrupled at $37.5 million; quintupled at $50 million; and returns nine times the original investment at $100 million." *Id*.

Thus, it is clear that the promissory notes guaranteed, as Grimes argues, a doubling of the investment if the verdict is $12.5 million. In fact,

_____

[20] The Fretz demand note was identical, except it was for the sum of $150,000.

the Ardleigh promissory note was signed after the trial court rendered the $12.5 million verdict.[21]  Accordingly, the "litigation participation" is an element of damages no different than the repayment of the principal, interest, and attorneys' fees.  Thus, the trial court erred in failing to include it as an element of damages.  Therefore, we vacate the verdict and remand the case to the trial court to calculate a new damages verdict.

Summary judgment in favor of Peoples, LaBarre, and Gross McGinley affirmed.  As to PDI, case remanded for proceedings consistent with this memorandum.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

Date: 10/27/2015

---

[21] The jury returned the verdict on June 24, 2005, and the Ardleigh investment was made in 2007.  The Fretz investment was made on June 9, 2005, which was in the middle of trial.